IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 16-cv-00374-PAB-SKC

G.W., by his mother and legal guardian, J.W., in her own right,

     Plaintiffs,

v.

BOULDER VALLEY SCHOOL DISTRICT and
JEFFERSON COUNTY SCHOOL DISTRICT R-1,

     Defendants.
_____

# AMENDED ORDER
_____

This matter is before the Court on plaintiffs' Amended Complaint [Docket No. 82] and Opening Brief [Docket No. 105]. Plaintiffs, G.W. and his mother, J.W., request reversal of two decisions by the State of Colorado, Office of Administrative Courts: (1) a decision dismissing J.W.'s claims that Boulder Valley School District ("BVSD") failed to provide G.W. with a free appropriate public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*; and (2) a decision ordering J.W. to comply with Jefferson County School District's ("JCSD") requests to evaluate G.W. for purposes of developing an individualized educational plan ("IEP"). *See* Docket No. 82 at 5. Plaintiffs also assert claims against BVSD and JCSD for disability discrimination under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* *See* Docket No. 82 at 5-6. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i)(3)(A).

## I.  FACTUAL BACKGROUND[1]

### A.  Boulder Valley School District

G.W. was born in March 1996 and suffers from a traumatic brain injury ("TBI"). AR Vol. IV at 54-66; Supp. AR Vol. I at 35.[2]  It is undisputed that, at all times relevant to this appeal, G.W. qualified for educational services under the IDEA.  *See* Docket No. 105 at 9; Docket No. 111 at 3; Docket No. 110 at 2.[3]

G.W. attended public school between first and sixth grades.  AR Vol. I at 256; AR Vol. IV at 1-2 (Exhibit 2), 55 (Exhibit 6).  Toward the end of sixth grade, G.W. began having more behavioral issues, resulting in his out-of-district placement the following

---

[1]In recounting these facts, the Court gives due weight to the factual findings of the administrative law judge ("ALJ"), which appear to be largely unchallenged by the parties.  *See L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004).

[2]The administrative record consists of two sets of conventionally filed materials. The first set, filed on August 16, 2016 and consisting of five volumes, *see* Docket No. 88, will be cited in this order as "AR" followed by the volume and page number.  The second set, filed on September 15, 2016 and consisting of three volumes, *see* Docket No. 94, will be cited as "Supp. AR" followed by the volume and page number.

[3]While G.W. is now 23 years old and no longer eligible for services under the IDEA, *see* 20 U.S.C. § 1412(a)(1)(A) (requiring states to ensure a "free appropriate public education" for "all children with disabilities . . . between the ages of 3 and 21"), plaintiffs' claim for compensatory education is not moot.  *See Lauren C. ex rel. Tracey K. v. Lewisville Indep. Sch. Dist.*, 904 F.3d 363, 373 n. 7 (5th Cir. 2018) (recognizing that "compensatory claims under IDEA may not be mooted by expiration of special education eligibility"); *Barnett v. Memphis City Schs.*, 113 F. App'x 124, 126-27, 126 n.1 (6th Cir. 2004) (affirming district court's determination that IDEA claim for compensatory services was not moot even though student was twenty-four at the time of the district court's decision); *Bd. of Educ. of Oak Park & River Forest High Sch. Dist. 200 v. Ill. State Bd. of Educ.*, 79 F.3d 654, 656 (7th Cir. 1996) (holding that the IDEA authorizes the award of compensatory educational services after a child reaches the age of 21); *Pihl v. Mass. Dep't of Educ.*, 9 F.3d 184, 189 (1st Cir. 1993) (holding that plaintiff was entitled to seek compensatory education under the IDEA even though he was beyond the age of entitlement).

school year.  AR Vol. I at 256; AR Vol. IV at 1-2 (Exhibit 2), 55 (Exhibit 6).[4]  G.W.

returned to public school for the beginning of eighth grade, but transitioned to Monarch

High School after being suspended for a behavioral incident.  AR Vol. I at 256; AR Vol.

IV at 1 (Exhibit 2), 55 (Exhibit 6).  While at Monarch, G.W. worked one-on-one with

Dawn Collamer, a behavioral consultant for BVSD, for about four months.  Supp. AR

Vol. I at 147, 251-52; AR Vol. IV at 56 (Exhibit 6).  J.W. testified that G.W. did well

during this period.  Supp. AR Vol. I at 251.  At some point, G.W. began working with a

different one-to-one aide and his behavioral issues increased.  AR Vol. IV at 56 (Exhibit

6).  BVSD and J.W. agreed that G.W.'s placement at Monarch was no longer working,

so they moved him to Creative Perspectives, a/k/a Spectra Autism Center, in August

2012.  AR Vol. IV at 1 (Exhibit 1), 56 (Exhibit 6); Supp. AR Vol. I at 36-37; AR Vol. IV at

1 (Exhibit 2).[5]  At an annual IEP review meeting on June 18, 2013, G.W.'s IEP team

determined that a separate school/day treatment program was the least restrictive

environment that could meet G.W.'s behavioral needs and recommended his continued

---

[4]Here, the term "placement" is used colloquially to refer to the location of delivery
of services.  As discussed in more detail below, however, the technical meaning of
"placement" under the IDEA and Exceptional Children's Educational Act ("ECEA") is the
level of special education and related services required by a child's IEP, not the specific
school or geographic location where those services are delivered.  *See* Colo. Code
Regs § 301-8:2220-R-4.03(8)(a) (explaining that the "terms 'placement' or 'educational
placement' are used interchangeably and mean the provision of special education and
related services and do not mean a specific place, such as a specific classroom or
specific school"); 34 C.F.R. § 300.115 (describing the "continuum of alternative
placements" to include "regular classes, special classes, special schools, home
instruction, and instruction in hospitals and institutions"); *see also Urban ex rel. Urban v.
Jefferson Cty. Sch. Dist. R-1*, 89 F.3d 720, 727 (10th Cir. 1996) (distinguishing between
an appropriate education and placement in a specific school).

[5]Creative Perspectives changed its name to Spectra Autism Center in 2013.  AR
Vol. IV at 1 (Exhibit 1).

placement at Spectra. AR Vol. IV at 3, 19-21 (Exhibit 2). According to the IEP

document, G.W.'s "IEP team [was] in agreement with [his IEP]." *Id.* at 21.

On September 23, 2013, neurologist Amy K. Connery, Psy. D., conducted an

independent educational evaluation of G.W. using the following assessment tools: the

Weschler Adult Intelligence Scale, Fourth Edition; the Weschler Individual Achievement

Test, Third Edition; the Grooved Pegboard Test; the Rey Complex Figure Test and

Recognition Trial; the Wide Range Assessment of Memory and Learning - 2; a

Behavior Rating Inventory of Executive Function; the Adaptive Behavior Assessment

System, Second Edition; a writing sample; a records review; and a clinical interview.

AR Vol. IV at 54 (Exhibit 6). In her report dated October 7, 2013, Dr. Connery found

that G.W. had significant delays in cognitive functioning, executive functioning,

concentration, and self-regulation, with relative areas of strength in verbal ability and

math computation. AR Vol. IV at 58-63 (Exhibit 6). She stated that G.W. would

"continue to require intensive, individualized programming" built around his academic

strengths and weaknesses, and that "continued efforts to develop a consistent

behavioral plan that [would] support [G.W.] in better tolerating frustration and navigating

challenges in the academic environment would be a critical component to his

educational plan." AR Vol. IV at 63. At the administrative hearing, Scott Sparks,

Director of Secondary Special Education for BVSD, testified that Dr. Connery's

evaluation led him to believe that BVSD needed to look for a program that "specifically

focused on the traumatic brain injury." Supp. AR Vol. 1 at 41.

G.W. was discharged from Spectra Autism Center on October 18, 2013. AR Vol.

IV at 33 (Exhibit 3). On November 5, 2013, BVSD entered into an agreement with

Humanex Academy, a private school in Englewood, Colorado, to provide G.W. with day services. AR Vol. IV at 69-82 (Exhibit 9); Supp. AR Vol. 1 at 42-43. On November 14, 2013, G.W.'s IEP team met to determine G.W.'s continued eligibility for special education. *See* AR Vol. IV at 83 (Exhibit 10), 85 (Exhibit 11). The IEP team found that G.W. continued to qualify for services as a student with TBI, AR Vol. IV at 83 (Exhibit 10), and that a separate school was "the most appropriate placement to meet G.W.'s needs going forward." AR Vol. IV at 85 (Exhibit 11). This determination was based on input from G.W.'s mother as well as evaluations conducted by Dr. Connery and Spectra staff. AR Vol. IV at 85 (Exhibit 11).

Following behavioral incidents on November 15 and 19, 2013, Humanex determined it could no longer serve G.W. AR Vol. IV at 87-90 (Exhibit 12). G.W. was dismissed from Humanex on November 19 or 20, 2013. AR Vol. IV at 90 (Exhibit 12), 93 (Exhibit 14); AR Vol. I at 258; Supp. AR Vol. 1 at 48. On December 2, 2013, Mr. Sparks and J.W. met to discuss alternative placements. AR Vol. IV at 97 (Exhibit 15); Supp. AR Vol. I at 49. Over the course of the next month, Mr. Sparks and J.W. researched several placement options, including Cherry Creek School District, Learning Services, Timberridge in Benson, Arkansas, Ivy Street School in Brookline, Massachusetts, and Lakeview Neurorehabilitation Center ("Lakeview") in Effingham, New Hampshire. *See* AR Vol. IV at 97-178 (Exhibit 15). The first three placement options were ruled out on the basis that they would not accept G.W. or were unable to meet his needs. *See* AR Vol. IV at 104, 106, 139 (Exhibit 15); Supp. AR Vol. I at 50. However, both the Ivy Street School and Lakeview were determined to be appropriate placements. AR Vol. IV at 174 (Exhibit 15); Supp. AR Vol. I at 58. On December 24,

2013, J.W. sent an email to Ron Yauchzee, Executive Director of Special Education for

BVSD, requesting an update on the status of G.W.'s educational programming and

noting it was her "understanding that both the district and [she] ha[d] pursued all

appropriate programs in Colorado and those facilities ha[d] said they [could] not serve

[G.W.]." AR Vol. IV at 167 (Exhibit 15). J.W. stated that she had "been moving forward

with appropriate out of state programs, such as the Ivy School and Lakeview." *Id.* On

January 6, 2014, J.W. emailed Mr. Yauchzee stating that both she and G.W. preferred

Lakeview due to safety concerns about the Ivy Street School. AR Vol. IV at 176

(Exhibit 15).

On January 9, 2014, Mr. Sparks emailed J.W. a prior written notice for an IEP

meeting to discuss G.W.'s possible residential placement at an out-of-state school. AR

Vol. IV at 182 (Exhibit 17); Supp. AR Vol. I at 58. At the meeting held on January 16,

2014, G.W.'s IEP team identified a residential facility as the least restrictive

environment capable of meeting G.W.'s needs and Lakeview as G.W.'s recommended

placement. *See* AR Vol. IV at 229-30 (Exhibit 19). Although the IEP document

produced at the meeting notes that J.W. desired G.W. to "gain the skills to return to

Humanex Academy," AR Vol. IV at 223 (Exhibit 19), there was no apparent

disagreement regarding G.W.'s educational needs or the type of program that would be

appropriate for him. Supp. AR Vol. I at 63.

On January 17, 2014, BVSD entered into an agreement with Lakeview for

residential education services. AR Vol. IV at 231 (Exhibit 20). G.W. began school at

Lakeview on January 20, 2014. AR Vol. IV at 244 (Exhibit 21); AR Vol. IV at 259

(Exhibit 22). On January 22, 2014, J.W. emailed Mr. Sparks that Lakeview was "an

amazing school." AR Vol. IV at 244 (Exhibit 21).

G.W. attended Lakeview from January 2014 to June 2014. Records from the school indicate that, although G.W. performed well socially and academically, he continued to engage in verbal and physical acts of aggression. *See* AR Vol. IV at 259-69 (Exhibit 22), 284 (Exhibit 25); AR Vol. I at 259. The goal summary for March 2014 stated that G.W. would "not return home until he had 3 months of no aggressions." AR Vol. IV at 268 (Exhibit 22); *see also* Supp. AR Vol. I at 73.

On March 6 and 7, 2014, G.W. underwent a neuropsychological evaluation at Lakeview. AR Vol. IV at 284 (Exhibit 25). The evaluation report incorporated findings from previous assessments, including Dr. Connery's September 2013 independent educational evaluation, as well as several new tests, including the California Verbal Learning Test, Second Edition; Conner's Continuous Performance Test, Second Edition; the Delis Kaplan Executive Function System; the Hooper Visual Organization Test; the Visual Form Discrimination Test; the Wechsler Memory Scale, Fourth Edition; and the Wisconsin Card Sort Test. AR Vol. IV at 284-85 (Exhibit 25). Lakeview also completed a functional behavioral assessment ("FBA") and behavior intervention plan for G.W. in March 2014. *See* AR Vol. IV at 280 (Exhibit 24), 310 (Exhibit 28).

On February 7, 2014, J.W. informed Mr. Sparks that G.W. would become eligible for community-based services through Medicaid when he turned eighteen in March 2014. AR Vol. IV at 294 (Exhibit 26); AR Vol. I at 259. In February 2014, J.W. corresponded with Brenda Newton at Humanex, who indicated that the school was "open to reviewing [G.W.'s] progress, and determining if he [was] a fit for Humanex at [that] time." AR Vol. IV at 300 (Exhibit 26). In response to an email from J.W. on

February 28, 2014, Mr. Sparks stated that BVSD would need to look at G.W.'s "needs and [the] depth of services required to meet his needs" before reconsidering his current placement.  AR Vol. IV at 299 (Exhibit 26).  On March 20, 2014, Mr. Sparks told Jamie Fox, a case manager at Lakeview, that BVSD did not yet have a placement option for G.W. in Colorado.  AR Vol. IV at 304 (Exhibit 26).  By that time, J.W. had expressed a desire for G.W. to return to Humanex.  AR Vol. I at 259; AR Vol. IV at 304 (Exhibit 26), 322 (Exhibit 30).

In June 2014, there were two incidents at Lakeview that caused J.W. to have safety concerns about G.W.'s placement.  In the first incident, Lakeview changed G.W.'s residence due to construction.  AR Vol. IV at 351-56 (Exhibit 33).  The second incident involved a conflict between G.W. and a staff member during a trip to the allergist.  AR Vol. IV at 360-64 (Exhibit 33).  After speaking with Lakeview following the second incident, Mr. Sparks informed J.W. that G.W. was "safe and happy" and that the the staff member would not be in contact with G.W. at any time.  AR Vol. IV at 362 (Exhibit 33).  He reiterated that "[c]ontinued placement at Lakeview [was] the district's provision of FAPE."  *Id.*

On July 14, 2014, J.W. notified Mr. Sparks that G.W. would "not be returning to Lakeview because it [was] no longer his LRE."  AR Vol. IV at 368 (Exhibit 35).  G.W.'s IEP team held an IEP review meeting on July 31, 2014.  AR Vol. IV at 384 (Exhibit 37), 385 (Exhibit 38).  At the meeting, J.W. expressed her concern that "Lakeview [was] no longer [G.W.'s] least restrictive environment" and requested that BVSD "consult with other agencies, either in or out of the State of Colorado, so [G.W. could] receive his education in the State of Colorado."  AR Vol. IV at 387 (Exhibit 38).  However, the

remainder of G.W.'s IEP team agreed, over J.W.'s objection, that Lakeview remained an appropriate placement for G.W.  AR Vol. IV at 412 (Exhibit 38).

At or around the time of the IEP meeting, J.W. asked that BVSD conduct a reevaluation of G.W.  *See* AR Vol. IV at 423 (Exhibit 40).  BVSD denied that request on August 5, 2014, stating that G.W.'s "most recent reevaluation," which included Dr. Connery's neuropsychological report from October 7, 2013, was "current and descriptive of [G.W's] performance and functioning."  AR Vol. IV at 423 (Exhibit 40).  On September 22, 2014, J.W. sent another request for a reevaluation to Mr. Yauchzee.  AR Vol. IV at 443 (Exhibit 45).  She also asked that BVSD conduct a functional behavioral assessment, including an observation of G.W. in an educational setting.  *Id.*  Mr. Yauchzee denied these requests, stating that G.W.'s current reevaluation and FBA were less than a year old.  AR Vol. IV at 445 (Exhibit 46).

On October 1, 2014, J.W. informed BVSD that the Governor of New Hampshire had prohibited state government agencies from placing new patients at Lakeview due to reports of mistreatment and neglect.  AR Vol. III at 674-75 (Exhibits D & E); AR Vol. IV at 459 (Exhibit 49).  Mr. Yauchzee responded that BVSD was ready and willing to offer G.W. a FAPE and that, should J.W. "wish to revisit the current location of services at Lakeview, BVSD would be open to consideration of the Ivy Street School."  AR Vol. IV at 459 (Exhibit 49).  On October 14, 2014, J.W. sent Mr. Yauchzee an email expressing safety concerns about Ivy Street School and stating that she did not think it was in G.W.'s "best interest to be removed from the State of Colorado."  AR Vol. IV at 461 (Exhibit 49).

On November 10, 2014, G.W.'s IEP team met to discuss the "location of delivery

of services identified in [G.W.'s] current IEP." AR Vol. IV at 481 (Exhibit 51). At the

meeting, J.W. requested a reevaluation of G.W. and a follow-up meeting to reconsider

G.W.'s placement. *See* AR Vol. IV at 483 (Exhibit 52).[6] In an email dated November

13, 2014, Mr. Yauchzee explained that "the District ha[d] properly denied [J.W.'s

requests] because the current evaluation and IEP include[d an] accurate representation

of educational services and goals to address [G.W's] educational needs." AR Vol. IV at

483 (Exhibit 52). According to Mr. Yauchzee, BVSD had invited J.W. to suggest other

options for location of services at the November 10, 2014 meeting, but J.W. had failed

to recommend any schools fitting within the parameters identified by the district. *Id.* In

a follow-up email on November 14, 2014, Mr. Yauchzee reiterated that BVSD's offer of

FAPE was the Ivy Street School in Boston. AR Vol. III at 708.

From approximately July 2014 to April 2015, G.W. lived at an apartment in

Boulder with two live-in caregivers. AR Vol. I at 261; AR Vol. IV at 377 (Exhibit 36),

425-35 (Exhibit 42). He attended a day program four days a week, but he did not

---

[6]There is some disagreement over whether the IEP team agreed to a
reevaluation at the November 10, 2014 meeting. At the administrative hearing, J.W.
testified that the IEP team agreed to conduct an "updated evaluation" of G.W. for
purposes of determining an appropriate placement. Supp. AR Vol. I at 254; *see also*
AR Vol. III at 609-10 (Exhibit A), 708 (Exhibit G). In contrast, Mr. Sparks testified that
the purpose of the November 10, 2014 meeting was to "lay out the Ivy Street School" as
G.W.'s place of attendance, not to develop a new IEP, and that there was no
agreement on conducting a reevaluation. Supp. AR Vol. I at 156-58. The Court finds
that BVSD's communications regarding the November 10, 2014 meeting provide ample
support for the ALJ's finding that the meeting was "not an IEP meeting in the eyes of
the School District." AR Vol. I at 263; *see* AR Vol. III at 693 (Exhibit G); AR Vol. IV at
481 (Exhibit 51); Supp. AR Vol. I at 156-58. The Court further finds that a
preponderance of the evidence supports BVSD's position that there was no agreement
at the November 10, 2014 meeting to conduct a reevaluation. *See* AR Vol. IV at 483
(Exhibit 52); Supp. AR Vol. I at 156-58.

receive educational services.  Supp. AR Vol. I at 259.   Reports from G.W.'s caregivers indicate that he continued to have difficulties with behavior and self-regulation.  *See* AR Vol. IV at 425-35 (Exhibit 42).

On April 28, 2015, G.W. began attending Wheat Ridge Regional Center ("WRRC") in Arvada, Colorado.  Supp. AR Vol. I at 256, 260-63.[7]  J.W. testified at the administrative hearing that G.W. would stay at WRRC during the week and return to his Boulder apartment on weekends, where he was supported by a live-in aide.  *See* Supp. AR Vol. I at 260-61.  WRRC's day program is vocational and does not include educational services.  Supp. AR Vol. I at 263.  The parties agree that the Jefferson County School District became G.W.'s "administrative unit of attendance" on April 28, 2014 and thus legally responsible for providing G.W. with a FAPE.  *See* Docket No. 105 at 11; Docket No. 110 at 4; Docket No. 111 at 10;  *see also* Colo. Code Regs. § 301-8:2220-R-2.02(1)-(2)(b), 8.02(1).[8]

## B.  Jefferson County School District R-1

In May 2015, J.W. enrolled G.W. in JCSD.  Supp. AR Vol. III at 38.  On May 28, 2015, she consented to JCSD evaluating G.W. for purposes of developing a new IEP

---

[7]Based on J.W.'s testimony, it appears that WRRC is a residential center offering sheltered employment during the day.  *See* Supp. AR at 262-63.

[8]Plaintiffs state that JCSD became G.W.'s "district of residence" on April 28, 2015.  Docket No. 105 at 11.  To the extent that this statement was not in error, Colorado regulations clearly provide that when "a child with a disability is living at one of the regional centers, . . . such child shall be deemed to reside where the parent or guardian of such child resides."  Colo. Code Regs. § 301-8:2220-R-2.02(1)(a). Because J.W. has continued to reside in Boulder, BVSD remains G.W.'s administrative unit of residence.  *See* Docket No. 82 at 1, ¶ 1; Colo. Code Regs. § 301-8:2220-R-2.02(1)(a).

for the 2015-2016 school year.  AR Vol. V at 808-09 (Exhibit A), 812 (Exhibit B); Supp. AR Vol. III at 37-41.  JCSD planned to complete the necessary assessments at WRRC. Supp. AR Vol. III at 41.  In July, however, J.W. objected to JCSD evaluating G.W. in a day program setting rather than an educational setting.  *See* AR Vol. V at 821.  On August 25, 2015, J.W. signed another consent form for JCSD to evaluate G.W., but specified that JCSD was permitted to proceed with the evaluations/assessments "in an educational setting."  AR Vol. V at 825.  On September 21, 2015, Becky Dancer, the Director of Special Education for JCSD, emailed J.W. that JCSD had "been working to evaluate [G.W.] so that an IEP meeting [could] be convened," but that J.W. had "refused to allow the District to conduct assessments and observations at Wheat Ridge Regional Center (WRRC), or confer with any of [G.W.'s] service providers at WRRC." AR Vol. V at 840 (Exhibit F).  Ms. Dancer stated that JCSD could not complete G.W.'s comprehensive evaluation without "unfettered access to [G.W.] and his current service providers at WRRC."  *Id.*  She further explained that, if J.W. declined to provide consent by September 22, 2015, JCSD would "seek an order permitting the District to conduct the evaluation."  *Id.*

On September 22, 2015, J.W. emailed Ms. Dancer that there was "no legal basis" for her to consent to JCSD speaking with WRRC and obtaining G.W.'s records unless JCSD agreed that residential services were a necessary "educational benefit." AR Vol. V at 852.  On a consent form dated September 23, 2015, J.W. indicated that she did "not consent to evaluations, assessments and/or observations to be conducted at WRRC."  AR Vol. V. at 861.

## II. PROCEDURAL BACKGROUND

### A. J.W. v. Boulder Valley School District

On July 31, 2015, J.W. filed a due process complaint with the Colorado Department of Education, Office of Administrative Courts, alleging that BVSD violated G.W.'s procedural and substantive rights under the IDEA and requesting a private school placement for G.W. in Colorado. AR Vol. I at 3-11. On August 10, 2015, BVSD filed a response and notice of insufficiency stating that the complaint did not "set forth any appropriate proposed resolution of [the] matter." AR Vol. I at 130. J.W. filed an amended due process complaint on September 11, 2015 requesting, among other things, G.W.'s immediate placement at Accelerated Schools in Denver and "compensatory educational costs of residential services and private school tuition." AR Vol. I at 183. BVSD filed an answer to the amended complaint on September 21, 2015. AR Vol. I at 189.

On November 2 and 9, 2015, the Office of Administrative Courts held a hearing on J.W.'s due process complaint. Supp. AR Vol. I, II. J.W. appeared without an attorney. Supp. AR Vol. I at 5. On November 17, 2015, the ALJ issued a decision finding that J.W. had failed to establish any violation of the IDEA or ECEA, Colo. Rev. Stat. §§ 22-20-101 *et seq*.[9] Specifically, the ALJ concluded that there was insufficient evidence to substantiate J.W.'s claims that BVSD had predetermined G.W.'s placement at the July 2014 and November 2014 meetings, failed to conduct necessary evaluations

_____

[9]Colorado has implemented the requirements of the IDEA through the ECEA and its accompanying regulations, Colo. Code Regs. §§ 301-8:2220-R-1.00 to 301-8:2220-R-12.10. The parties do not rely on any state provisions in their briefing.

of G.W., or denied G.W. a FAPE.  AR Vol. I at 263-65.

### B.  Jefferson County School District v. J.W.

On October 19, 2015, JCSD filed a due process complaint against J.W. seeking
to have G.W. evaluated for purposes of developing a new IEP.  AR Vol. II at 331; AR
Vol. III at 3.  A hearing was held on December 16, 2015, at which J.W. did not appear.
Supp. AR Vol. III at 3, 5.  On December 29, 2015, the ALJ issued a decision finding that
the evaluations sought by JCSD were "reasonable and properly focused on [G.W.'s]
disability and potential educational needs."  AR Vol. II at 605.[10]  The ALJ ordered JCSD
to conduct various assessments, directed J.W. not to interfere in those assessments,
and authorized WRRC to release information to JCSD regarding G.W.  AR Vol. II at
605-06.

### C.  Proceedings in This Court

On February 16, 2016, plaintiffs, G.W. and J.W., filed a *pro se* complaint against
BVSD, JCSD, and various individual defendants asserting violations of G.W.'s
substantive due process and equal protection rights, disability discrimination under
§ 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, and the Americans
with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and state-law claims for assault and
battery.  Docket No. 1 at 14-18.  On March 8, 2016, plaintiffs moved, pursuant to 20
U.S.C. § 1415(j), for an order requiring that G.W. remain in his then-current educational
placement pending resolution of the lawsuit.  *See* Docket No. 15.  The Court denied the

---

[10]The same ALJ presided over both administrative actions at issue in this lawsuit.
In his December 29, 2015 decision, the ALJ incorporated many of the facts found in his
earlier order on J.W.'s due process complaint against BVSD.  *See* AR Vol. II at 599.

motion on March 18, 2016, finding that there was no current educational placement because J.W. had not attended school since his removal from Lakeview in 2014. Docket No. 35 at 6.

*Pro bono* counsel entered his appearance on behalf of plaintiffs on May 25, 2016. Docket No. 65. On July 22, 2016, plaintiffs filed an amended complaint seeking review, under the IDEA, of the ALJ's decisions on J.W. and JCSD's due process complaints and asserting claims against BVSD and JCSD under § 504 of the Rehabilitation Act. Docket No. 82 at 5-6. Plaintiffs requested "compensatory educational services and compensatory damages in an amount to [be] proven at trial." *Id.* at 6. In a scheduling order entered on August 25, 2016, the parties stated that a trial was unnecessary and that the lawsuit could be resolved based on the parties' briefs and the administrative record. Docket No. 92 at 9. Plaintiffs filed their opening brief on November 30, 2016. Docket No. 105. On January 17, 2017, JCSD and BVSD filed separate response briefs, Docket Nos. 110, 111, to which plaintiffs replied. Docket No. 116. On December 8, 2017 and February 13, 2018, plaintiffs filed notices of supplemental authority in support of their claims. Docket Nos. 123, 124.[11]

### III. INDIVIDUALS WITH DISABILITIES IN EDUCATION ACT

The IDEA conditions federal education funding on a state's compliance with certain requirements intended to ensure that states identify, evaluate, and serve children with disabilities. *See* 20 U.S.C. §§ 1412, 1414, 1416. One such requirement

---

[11]The Court will consider the supplemental authority in resolving the parties' dispute.

is that states establish policies and procedures to ensure that a FAPE is made available

to every child between the ages of 3 and 21 who is determined to have a disability

within the meaning of the IDEA.  20 U.S.C.

§ 1412(a)(1).  A FAPE is defined as

> special education and related services that –
>
>> (A) have been provided at public expense, under public supervision and direction, and without charge;
>>
>> (B) meet the standards of the State educational agency;
>>
>> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>>
>> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).  The IDEA also requires that children with disabilities receive a

FAPE in the least restrictive environment ("LRE").  The LRE mandate provides that,

> [t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, [shall be] educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment [may occur] only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5); *see also* 34 C.F.R. § 300.114.

As indicated in subsection § 1401(9)(D), the central mechanism for ensuring

delivery of a FAPE in the least restrictive environment is the individualized education

program ("IEP"), a "written statement for each child with a disability" that identifies the

child's present level of performance, the child's short- and long-term goals, objective

criteria for measuring the child's progress, and the supplementary aids and services

16

necessary to meet the child's educational needs. 20 U.S.C. § 1414(d)(1)(A); *see also Honig v. Doe*, 484 U.S. 305, 311 (1988) (characterizing the IEP as the "centerpiece of the [IDEA's] education delivery system for disabled children"); *Murray by and through Murray v. Montrose Cty. Sch. Dist.*, 51 F.3d 921, 925 (10th Cir. 1995) ("The IEP is the basic mechanism through which th[e] goal of [providing a FAPE] is achieved for each disabled child."). Thus, the determination of whether a child has been provided a FAPE in the least restrictive environment turns in large part on the sufficiency of the child's IEP. *See, e.g.*, *A.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 675 (4th Cir. 2007) ("A school provides a FAPE by creating an [IEP] for each child."). Challenges to the adequacy of an IEP can be either procedural or substantive. *See Urban v. Jefferson County Sch. Dist. R-1*, 89 F.3d 720, 726 (10th Cir. 1996); *see also Bd. of Educ. of Hendrick Hudson Central Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206-07 (1982) (setting forth two-part framework for determining whether a state has satisfied its obligations under the IDEA: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?"). However, a procedural violation of the IDEA does not entitle a child to relief unless it has "resulted in substantive harm to the child or his parents; deprived an eligible student of an individualized education program; or resulted in the loss of an educational opportunity." *Sytsema ex rel. Sytsema v. Academy Sch. Dist. No. 20*, 538 F.3d 1306, 1313 (10th Cir. 2008) (internal brackets omitted) (quoting *Knable ex rel Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 765-66 (6th Cir. 2001)); *see also* 20

U.S.C. § 1415(f)(3)(E)(ii) (stating that, in "matters alleging a procedural violation, a hearing officer may find that a child did not receive a [FAPE] only if the procedural inadequacies – (I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits"); 34 C.F.R. § 300.513(a)(2) (same). Substantive harm may occur when the procedural violation effectively denies the child a FAPE, *id.*, or "seriously infringe[s] upon [the parent's] opportunity to participate in the IEP process." *Knable ex rel. Knable*, 238 F.3d at 765.

Plaintiffs assert both procedural and substantive violations of G.W.'s rights under the IDEA. Plaintiffs argue that BVSD violated the IDEA's procedural requirements by predetermining G.W.'s placement in a residential facility at the July 2014 IEP meeting and failing to reevaluate G.W. after J.W. removed him from Lakeview. Docket No. 105 at 20-21. They contend that BVSD and JCSD violated G.W.'s substantive rights when (1) BVSD denied G.W. a FAPE in the least restrictive environment between June 24, 2014 and April 28, 2015, *id.* at 16, and (2) JCSD failed to adopt G.W.'s IEP or provide him with comparable educational services after his move to Wheat Ridge Regional Center in 2015. *Id.* at 22.

## A.  Standard of Review

As the parties alleging a deficiency in G.W.'s educational services, plaintiffs bear the burden of proof. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005). In determining whether plaintiffs have met their burden, the Court "shall receive the

records of the administrative proceedings;" "shall hear additional evidence at the request of a party;" and, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). The Court reviews legal challenges *de novo*, without deference. *See O'Toole ex rel. O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, 144 F.3d 692, 699 (10th Cir. 1998). However, "though the statute specifies that review is *de novo*, the Supreme Court has interpreted the requirement that the district court receive the administrative record to mean that 'due weight' must be given to the administrative proceedings, the fact findings of which are considered prima facie correct." *Thompson R2-J Sch. Dist. v. Luke P., ex rel. Jeff P.*, 540 F.3d 1143, 1150 (10th Cir. 2008) (citation and quotation marks omitted).

### B.  Boulder Valley School District

#### 1.  Procedural Violations of the IDEA

##### a.  Predetermination

Plaintiffs argue that BVSD predetermined G.W.'s placement at the July 2014 IEP meeting by failing to give any "serious consideration . . . to . . . whether a public school educational placement could appropriately provide [G.W.] an appropriate education in the least restrictive environment." Docket No. 105 at 21.[12]

"Predetermination occurs when an educational agency has made a determination prior to the IEP meeting, including when it presents one educational

---

[12]While J.W. also argued before the ALJ that BVSD predetermined G.W.'s placement at the November 2014 meeting, plaintiffs do not press that claim in their opening brief.  *See* Docket No. 105 at 11 (addressing arguments to July 2014 IEP meeting).

placement option at the meeting and is unwilling to consider other alternatives." *Z.F. v. Ripon Unified Sch. Dist.*, 2013 WL 127662, at *6 (E.D. Cal. Jan. 9, 2013) (citing *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 858 (6th Cir. 2004)). Predetermination violates the IDEA in two ways. First, it contravenes the requirement that "placement be based on the IEP, and not vice versa." *K.D. ex rel. C.L. v. Dep't of Educ., Hawaii*, 665 F.3d 1110, 1123 (9th Cir. 2011) (citing *Spielberg ex rel. Spielberg v. Henrico Cty. Pub. Sch.*, 853 F.2d 256, 259 (4th Cir. 1988)). Second, it denies parents the opportunity to participate meaningfully in the "identification, evaluation, and educational placement of the child." *H.B. ex rel. P.B. v. Las Virgenes Unified Sch. Dist.*, 239 F. App'x 342, 344 (9th Cir. 2007) (unpublished) (quoting 20 U.S.C. § 1415(b)(1)).

The ALJ rejected J.W.'s predetermination claim, reasoning that Lakeview "was originally her choice for placement" and finding insufficient evidence of any viable alternative that could have adequately addressed G.W.'s educational needs. AR Vol. I at 264. While plaintiffs do not directly challenge the ALJ's finding, they maintain that BVSD predetermined G.W.'s placement by denying J.W.'s requests for a reevaluation and refusing to consider any placement other than a residential facility. *See* Docket No. 105 at 20-21; Docket No. 116 at 6-8.[13] BVSD responds that, given J.W.'s active

_____

[13]As previously discussed, the term "placement" has both a colloquial meaning – the particular location at which a student is receiving services – and a technical meaning – the level of services required to provide a child a FAPE. Plaintiffs appear to invoke the term's technical meaning in arguing that BVSD predetermined G.W.'s placement. *See* Docket No. 105 at 21 (arguing that BVSD predetermined G.W.'s placement by failing to consider "whether a public school educational placement could appropriately provide [G.W.] an appropriate education"); Docket No. 116 at 6-7 (arguing that BVSD failed to consider evidence that a residential facility was not G.W.'s LRE). However, to the extent plaintiffs do not challenge the nature/level of G.W.'s special education services, i.e., a residential placement, but rather the specific school location

participation in the "IEP process that resulted in G.W.'s enrollment at Lakeview," a finding that BVSD predetermined G.W.'s placement at the July 2014 IEP meeting would mean that "every non-initial IEP meeting in which a child's placement stays the same would be tantamount to predetermination" under the IDEA. Docket No. 111 at 12.

As an initial matter, the Court declines BVSD's invitation to create a categorical rule barring predetermination claims based on IEP meetings in which a school district continues a prior placement decision. The text of the governing regulation implicitly recognizes that a child's placement may be determined more than once a year, *see* 34 C.F.R. § 300.116(b)(1) (stating that a child's placement must be "determined *at least* annually" (emphasis added)), and there will be some circumstances in which a school district is obligated to reconsider a recent placement decision in order to ensure consistency between a child's placement and his/her IEP. *See id.*, § 300.116(b)(2) (requiring a child's placement to be based on his/her IEP). Similarly, a school district may be guilty of predetermination – even at a non-initial IEP meeting – if it comes to a meeting unwilling to consider other placement options based on the child's revised educational goals. *See id.*; *compare Deal*, 392 F.3d at 858 (citing cases in which courts rejected predetermination claims based on evidence that the school district had arrived at the IEP meeting with an "open mind").

In this case, however, plaintiffs have not offered any evidence that a residential placement was inconsistent with G.W.'s July 31, 2014 IEP or that the IEP team was

---

where those services were to be delivered, their predetermination claim also fails. Plaintiffs do not identify any other residential facility that they would have preferred over Lakeview and that could have accommodated G.W.'s educational needs.

unwilling to consider alternative placement options based on G.W.'s revised educational goals.  *See* Docket No. 105 at 20-21; Docket No. 116 at 6-9; *see also T.W. v. Unified Sch. Dist. No. 259, Wichita, Kan.*, 136 F. App'x 122, 133-34 (10th Cir. 2005) (unpublished) (holding that the school district did not predetermine the child's placement where the plaintiff failed to show that the IEP goals and objectives were inappropriate for the child and notes from three different IEP meetings indicated that "placement issues were . . . discussed in some detail, with pros and cons of the existing trial placement being hashed out by the participants").  Records from the June 2013 and January 2014 IEP meetings show that G.W.'s IEP team considered a range of placement options before determining that placement in a public school setting was insufficient to meet G.W.'s needs.  *See* AR Vol. IV at 20 (Exhibit 2), 229 (Exhibit 19). By January 2014, G.W. had been dismissed from two separate school placements – Spectra Autism Services and Humanex Academy – due to behavioral issues, and all members of G.W.'s IEP team, including J.W., agreed that a residential placement was appropriate.  *See* AR Vol. IV at 176 (Exhibit 15), 229 (Exhibit 19); Supp. AR Vol. I at 62-63.  Not only was J.W. instrumental in researching and identifying possible residential facilities for G.W. in December 2013 and January 2014, but she actively supported his placement at Lakeview after acknowledging that there was no in-state program sufficient to meet his needs.  *See* AR Vol. IV at 97-177 (Exhibit 15).

While plaintiffs assert that BVSD "refused to consider the information [J.W.] presented regarding G.W.'s ability to function and learn in a less restrictive setting," Docket No. 116 at 6, they do not cite any evidence showing that, in the six months between his initial placement at Lakeview and the July 31, 2014 IEP meeting, G.W.'s

educational needs had changed to such an extent as to warrant his transfer to a less restrictive environment. Records from Lakeview indicate that, although G.W. was performing well in his classes, *see* AR Vol. IV at 263-67 (Exhibit 22), he had not met all of the treatment goals necessary for discharge to another program. *See* AR Vol. IV at 261, 268 (Exhibit 22). The neuropsychological evaluation performed at Lakeview in March 2014 further indicates that G.W.'s educational needs had remained largely consistent with those identified in Dr. Connery's October 2013 report. *See* AR Vol. IV at 285 (Exhibit 25) (noting similar results for working memory and processing speed), 287 (noting that current and previous testing "showed difficulty integrating smaller details with the whole picture on drawing and constructional tasks" and "poor visual and verbal learning"), 289 (noting significant difficulties with visual reasoning, memory, executive functioning, social functioning, and general adaptive functioning).

Plaintiffs also do not point to any evidence showing that BVSD arrived at the July 31, 2014 meeting unwilling to consider alternative placement options. *Compare Deal*, 392 F.3d at 858 (finding predetermination based on evidence that "the School System steadfastly refused even to discuss the possibility of providing an ABA program, even in the face of impressive results"). The IEP document produced at the meeting reflects that BVSD considered J.W.'s concerns about Lakeview, but determined that G.W.'s educational goals could "best be achieved at [Lakeview] due to the unique and personalized instruction and support." AR Vol. IV at 387 (Exhibit 38); *see also A.G. v. Hawaii*, 2015 WL 3822309, at *5-6 (D. Haw. June 19, 2015) (finding no predetermination where the parents had the opportunity to ask questions and voice

concerns about the school district's proposed placement at IEP meeting).  While the IEP team does not appear to have discussed the entire range of placement options at the July 31, 2014 meeting, *see* AR Vol. IV at 385-412 (Exhibit 38), there is no evidence of alternative placements that could have accommodated G.W.'s needs at that time.[14] Moreover, plaintiffs do not cite any authority for the proposition that a school district must revisit the full continuum of placement options at each IEP meeting, absent evidence that a change of placement is warranted.  *See* 34 C.F.R. § 300.116(b)(1) (providing only that a child's placement be "determined at least annually"); *see also J.S. by Solorio v. Clovis Unified Sch. Dist.*, 2017 WL 3149947, at *11 (E.D. Cal. July 25, 2017) (finding that the school district "was not required to consider a 'continuum' of placement options at the IEP meeting"); *A.G.*, 2015 WL 3822309, at *5 (finding it "difficult to imagine a predetermination of placement claim where a student is placed in a program under a previous IEP to which the parents did not object, and is then placed

_____

[14]J.W. requested at the IEP meeting that Lakeview "consult/train people in Colorado" to meet G.W.'s educational needs.  AR Vol. IV at 387-88 (Exhibit 38). However, BVSD was not required to create a new educational program so G.W. could receive services in Colorado.  *Cf. J.T. ex rel. A.T. v. Dumont Public Schools,* 533 F. App'x 44, 51 (3d Cir. 2013) (unpublished) (noting that the "IDEA permits schools to provide special education services in a centralized location, as opposed to in each student's neighborhood school"); *White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 380 (5th Cir. 2003) (holding that school district's decision to provide educational services at a centralized location was a "permissible policy choice under the IDEA"); *Urban by Urban v. Jefferson Cty. Sch. Dist. R-1*, 89 F.3d 720, 727 (10th Cir. 1996) (holding that the IDEA does not give a student the "right to a placement at a neighborhood school"); *Cheltenham Sch. Dist. v. Joel P. by Suzanne P.*, 949 F. Supp. 346, 351 (E.D. Pa. 1996) (holding that the "IDEA and accompanying regulations [did] not require Cheltenham to create the Life Skills Support program within its own school district").

in that same program during the next IEP cycle").[15]  Last, the Court rejects plaintiffs'

argument that BVSD's refusal to reevaluate G.W. constitutes evidence of

predetermination in July 2014.  *See* Docket No. 105 at 21.  As discussed in more detail

below, BVSD was not obligated to conduct a reevaluation in July 2014 because G.W.'s

most recent reevaluation, which included Dr. Connery's neuropsychological report, was

less than a year old.  *See* 34 C.F.R. § 300.303(b)(1) (stating that reevaluations "[m]ay

not occur more than once a year, unless the parent and the public agency agree

otherwise").

      In summary, the preponderance of the evidence supports the ALJ's finding that

BVSD did not predetermine G.W.'s continued residential placement at Lakeview in July

2014.

### b.  Reevaluation

      Plaintiffs argue that BVSD violated the IDEA by refusing to reevaluate G.W. after

his return from Lakeview to determine whether his educational needs could be met in a

less restrictive environment.  Docket No. 105 at 21.[16]  BVSD responds that, because

G.W. had a neuropsychological evaluation in March 2014, the IDEA barred further

---

[15]The cases cited by the parties are inapposite.  In *Spielberg*, the court found
that the school district had predetermined the student's placement by deciding to
change his placement from a private school to a public school before developing his
IEP.  *See* 853 F.2d at 257-58.  Likewise, in *Deal*, 392 F.3d 840 (6th Cir. 2004), the
court found predetermination based on the school district's repeated refusal, over the
course of a three-year period, to provide the student with requested services that had
already proven effective.  *See* 392 F.3d at 845-46, 858.

[16]Although plaintiffs do not specify in their opening brief precisely when BVSD
should have conducted a reevaluation, their due process complaint alleged that BVSD
violated the IDEA by failing to conduct assessments and evaluations in both July 2014
and November 2014.  AR Vol. 1 at 4.

evaluation until March 2015.  Docket No. 111 at 11-12.

The governing regulations define an "evaluation" as the "procedures used . . . to determine whether a child has a disability and the nature and extent of the special education and related services that the child needs."  34 C.F.R. § 300.15;  *see also* Colo. Code Regs. § 301-8:2220-R-2.16.  The IDEA mandates both an "initial evaluation" of a child with a disability – i.e., an evaluation performed "before the initial provision of special education and related services," 20 U.S.C. § 1414(a)(1)(A) – and reevaluations whenever the agency determines that a reevaluation is warranted or "the child's parents or teacher requests a reevaluation."  20 U.S.C. § 1414(a)(2)(A); 34 C.F.R. § 300.303(a).  A reevaluation must be conducted "once every 3 years," but "not more than once a year, unless the parent and the public agency agree otherwise."  *See* 34 C.F.R. § 300.303(b).[17]

Relying on this latter provision, BVSD argues that it was not required to conduct

_____

[17]In addition to requiring periodic reevaluations, the IDEA's implementing regulations afford parents the "right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency."  34 C.F.R. § 300.502(b)(1).  This provision is not at issue in this case because J.W. requested a reevaluation in order to obtain additional information about G.W.'s educational needs, not to rebut an evaluation obtained by BVSD.  *See* Docket No. 105 at 21 (arguing that BVSD "failed to evaluate [G.W.] in an effort to determine whether his educational needs now, as opposed to when he had been originally [ ] placed at Lakeview, could be provided in a less restrictive environment"); *see also Tyler V., ex rel. Desiree V. v. St. Vrain Valley Sch. Dist. No. RE-1J*, No. 07-cv-01094-PAB-KLM, 2011 WL 1045434, at *4 (D. Colo. Mar. 21, 2011) (denying parents' request for reimbursement of costs of independent educational evaluation where parents did "not contend that the IEE was performed to rebut a District evaluation"); *R.L. ex rel. Mr. L. v. Plainville Bd. of Educ.*, 363 F. Supp. 2d 222, 234 (D. Conn. 2005) (holding that parents were not entitled to an independent educational evaluation at public expense where it was "undisputed that [the parents] desired the evaluation . . . as an additional source of information . . . , not because they disagreed with any of the defendant's evaluations").

a reevaluation in 2014 because there were already three current evaluations of G.W. at that time: (1) an independent educational evaluation conducted by Amy Connery, Psy.D., in late September/early October 2013, AR Vol. IV at 54 (Exhibit 6); (2) a neuropsychological evaluation conducted by Christina Young, M.A., and James Taylor, Ph.D., at Lakeview on March 6 and 7, 2014, AR Vol. IV at 290 (Exhibit 25); and (3) a functional behavioral assessment completed by Lakeview on March 1, 2014.  AR Vol. IV at 280 (Exhibit 24); Supp. AR Vol. 1 at 68.

The Court agrees with BVSD in part.  The record indicates that J.W. requested reevaluations on three separate occasions in 2014: first, after the July 2014 IEP meeting, AR Vol. IV. at 423 (Exhibit 40); Supp. AR Vol. 1 at 83; second, in a letter to Mr. Yauchzee on September 22, 2014, AR Vol. IV. at 443 (Exhibit 45); and third, in an email dated November 10, 2014, AR Vol. IV at 483 (Exhibit 52).  In her September 22, 2014 letter, J.W. asked BVSD to reevaluate G.W. "from a variety of sources" and to conduct a functional behavioral assessment involving an "[e]xtensive file review" and observation of G.W. in an educational setting.  AR Vol. IV. at 443 (Exhibit 45).  BVSD denied all three requests, stating that G.W.'s then-current reevaluation and functional behavioral assessment were less than a year old and accurately reflected G.W.'s educational needs.  *See* AR Vol. IV at 423 (Exhibit 40), 445 (Exhibit 46), 483 (Exhibit 52); AR Vol. III at 708 (Exhibit G).

The Court finds no error in BVSD's decision to deny J.W.'s requests for a reevaluation and functional behavioral assessment in July and September 2014.  At that time, the October 2013 reevaluation and the March 1, 2014 functional behavioral assessment from Lakeview were both less than a year old.  *See* 34 C.F.R.

27

§ 300.303(b). The Court disagrees, however, that BVSD was not required to conduct a reevaluation in November 2014.

In arguing that any claim for reevaluation was barred until March 2015, BVSD appears to equate the March 2014 neuropsychological evaluation performed at Lakeview with a "reevaluation" under the IDEA. But a "reevaluation" under the Act is not synonymous with an assessment. *See* 20 U.S.C. § 1414(b)(2)(B) (stating that an educational agency conducting a reevaluation may "not use any single measure or assessment as the sole criterion for . . . determining an appropriate educational program for the child"); *see also id.*, § 1414(b)(3)(B) (stating that a reevaluation must assess the child "in all areas of suspected disability"). Instead, it is a term of art that denotes compliance with a set of procedures for comprehensively assessing a child's educational needs. *See* 20 U.S.C. § 1414(b)-(c) (prescribing procedures for initial evaluations and reevaluations); 34 C.F.R. § 300.15 (defining "evaluation" as "procedures used in accordance with §§ 300.304 through 300.311"). The preponderance of the evidence does not support a finding that the March 2014 neuropsychological evaluation satisfied these requirements. For example, unlike the November 2013 reevaluation, there are no documents indicating that the 2014 neuropsychological assessment was "sufficiently comprehensive to appropriately identify all of the child's special education needs and related services needs." AR Vol. IV at 83 (Exhibit 10). Additionally, nothing in the record suggests that the parties viewed the March 2014 evaluation as a comprehensive reevaluation under 34 C.F.R. § 300.303. To the contrary, Mr. Sparks and Mr. Yauchzee consistently referred to the November 2013 reevaluation as the most recent reevaluation of G.W. in the summer

28

and fall of 2014. *See* AR Vol. IV at 416 (Exhibit 39) (August 4, 2014 email from Scott Sparks stating that the January 16, 2014 IEP contained "the most current results in the areas of Cognitive/intellectual functioning, Academic Achievement, Executive Functioning, Attention/concentration, Lateral dominance and motor functioning, Visuospatial processing, Learning and memory, [and] Emotional/behavioral functioning"), 423 (Exhibit 40) (August 5, 2014 prior notice of special education action denying request for reevaluation on the basis that the "most recent reevaluation included a neuropsychologist's report dated 10/7/13"), 445 (Exhibit 46) (September 23, 2014 prior written notice denying J.W.'s request for reevaluation on the ground that the "current reevaluation that included a neuropsychologist's report was performed on 10/17/13 less than a year ago").

Because the record shows that G.W.'s last reevaluation was completed on November 14, 2013, AR Vol. IV at 83 (Exhibit 10), G.W. was entitled to a reevaluation on November 14, 2014. *See* 20 U.S.C. § 1414(a)(2)(A)(ii) (stating that a "local educational agency *shall* ensure that a reevaluation of each child with a disability is conducted . . . if the child's parents or teacher requests a reevaluation" (emphasis added)). BVSD therefore violated the IDEA's procedural requirements by denying J.W.'s request for a reevaluation on that date. *See* AR Vol. III at 708 (Exhibit G).[18]

_____

[18]The ALJ incorrectly determined that BVSD was not required to conduct new assessments/evaluations in November 2014 because "there was insufficient evidence that new assessment/evaluations were required." AR Vol. I at 263. Because the governing statutory provision is phrased in the disjunctive, G.W. was entitled to a reevaluation at J.W.'s request regardless of whether BVSD thought that G.W.'s educational needs warranted a reevaluation. *See* 20 U.S.C. § 1414(a)(2)(A) (requiring a reevaluation "if the local educational agency determines that the educational or related services needs . . . of the child warrant a reevaluation; *or* . . . if the child's

The Court must next determine whether BVSD's failure to conduct a reevaluation in November 2014 resulted in "substantive harm to [G.W. or J.W.]; deprived [G.W.] of an individualized education program; or resulted in the loss of an educational opportunity." *Sytsema ex rel. Sytsema*, 538 F.3d at 1313 (internal quotation marks and brackets omitted); *see also Garcia v. Bd. of Educ. of Albuquerque Public Schs.*, 520 F.3d 1116, 1125 (10th Cir. 2008) (stating that, in lawsuits seeking award of compensatory education, question of whether a school district complied with the IDEA's procedural requirements is relevant only when the "procedural violation is alleged to have caused the substantive deprivation of a FAPE"); *T.S. v. Indep. Sch. Dist. No. 54, Stroud, Okla.*, 265 F.3d 1090, 1095 (10th Cir. 2001) (noting it is "well-settled that, without a claim that the FAPE was deficient, procedural defects are not actionable").

Here, plaintiffs have failed to demonstrate that BVSD's procedural violation resulted in substantive harm to G.W.'s rights under the IDEA. First, plaintiffs make no argument that BVSD's refusal to conduct a reevaluation "seriously infring[ed]" on J.W.'s ability to participate in the IEP process." *Knable ex rel. Knable*, 238 F.3d at 765. As discussed above, J.W. was actively involved in the IEP team's decision to change G.W.'s placement to Lakeview in January 2014. She was also present at the July 31, 2014 meeting where the IEP team considered her concerns about continuing G.W.'s placement at Lakeview. There is therefore no evidence that BVSD's refusal to conduct a reevaluation in November 2014 had any meaningful impact on J.W.'s ability to participate meaningfully in the development of G.W.'s IEP. *Compare Knable ex rel.*

---

parents or teacher requests a reevaluation" (emphasis added)).

*Knable*, 238 F.3d at 766 (holding that school district's failure to convene an IEP

conference violated the student's substantive rights under the IDEA by preventing the

parents from ever participating in an IEP conference), *with G.L. by and through S.H. v.*

*Saucon Valley Sch. Dist.*, 267 F. Supp. 3d 586, 605-06 (E.D. Pa. 2017) (holding that

the school district's failure to complete a reevaluation by the statutory deadline did not

deprive the parent of the opportunity to participate in the IEP process where the parent

participated in the original IEP meeting and was able to communicate with the student's

teacher about the student's progress at school).  As discussed in the next section,

plaintiffs have also failed to prove that BVSD's failure to conduct a reevaluation in

November 2014 deprived G.W. of an educational benefit.[19]

### 2. *Substantive Violation of the IDEA*

Plaintiffs argue that BVSD violated G.W.'s substantive rights under the IDEA by

failing to provide him a FAPE in the least restrictive environment between June 24,

2014 and April 28, 2015.  Docket No. 105 at 16.[20]  Specifically, plaintiffs contend that

_____

[19]To the extent there is any distinction between the analysis of whether a
procedural violation of the IDEA resulted in substantive harm and the inquiry into
whether a school district has violated the IDEA's substantive FAPE and LRE
requirements, plaintiffs make only one argument related to substantive harm – namely,
that BVSD denied G.W. a FAPE in the least restrictive environment by continuing his
placement at Lakeview in 2014.

[20]Plaintiffs do not argue that BVSD's offer of a FAPE at a residential facility was
not "reasonably calculated to enable [G.W.] to make progress appropriate in light of
[his] circumstances."  *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137
S. Ct. 988, 999 (2017); *see also Thompson R2-J Sch. Dist. v. Luke P., ex rel. Jeff P.*,
540 F.3d 1143, 1148 (10th Cir. 2008) (explaining that a plaintiff can demonstrate a
violation of the IDEA in one of two ways: by showing that the school district failed to
provide the student with a free and appropriate public education, or by showing that,
"despite the school district's provision of a free appropriate public education, it failed to
provide that education, to the maximum extent appropriate, in the least restrictive

BVSD denied G.W. a FAPE by continuing his placement at Lakeview in 2014 rather than providing him with educational services in a public school setting. *See* Docket No. 105 at 18-19; Docket No. 116 at 1-5. BVSD responds that a residential placement was G.W.'s least restrictive environment in 2014 due to his ongoing behavioral issues. *See* Docket No. 111 at 14-16.

The IDEA requires public agencies to "ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services." 34 C.F.R. § 300.115(a). On that continuum of placements, a residential facility is considered more restrictive than a day program, which is considered more restrictive than placement in a public school setting. *See S.M. v. Gwinnett Cty. Sch. Dist.*, 2015 WL 12910925, at *9 (N.D. Ga. May 29, 2015) (stating that an "IEP team must consider the continuum of placement options: (1) the general classroom; (2) instruction outside the general classroom; (3) a separate day school or program; (4) home-based instruction; (5) residential placement; and (6) hospital or homebound instruction"); *Marcus I. ex rel. Karen I. v. Hawaii Dep't of Educ.*, 2009 WL 3378589, at *2 n.6 (D. Haw. Oct. 21, 2009) (explaining that a "residential education facility completely integrates a student's education and residential programs" and "is considered a more restrictive environment than a day-program . . . , and much more restrictive than placement in a public school"); *see also* 34 C.F.R. § 300.115(b)(1) (providing that continuum of alternative placement options must include "instruction in

_____

environment"). Their only contention is that BVSD could have provided the same educational benefits in a less restrictive environment. *See* Docket No. 105 at 16-19; Docket No. 116 at 1-5. Accordingly, the Court limits its analysis to whether a residential placement was G.W.'s least restrictive environment.

regular classes, special classes, special schools, home instruction, and instruction in

hospitals and institutions").  The IDEA's so-called "least restrictive environment"

mandate requires school districts to ensure that children with disabilities, "including

children in public or private institutions or other care facilities," are educated with

children who are not disabled "[t]o the maximum extent appropriate," and that

> special classes, separate schooling, or other removal of children with
> disabilities from the regular educational environment occurs only when the
> nature or severity of the disability of a child is such that education in
> regular classes with the use of supplementary aids and services cannot
> be achieved satisfactorily.

20 U.S.C. § 1412(a)(5); *see also L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 976

(10th Cir. 2004) (discussing LRE mandate).  To determine whether a school district has

complied with this requirement, courts in the Tenth Circuit apply the two-part test from

*Daniel R.R. v. Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989), which asks: (1)

"whether education in a regular classroom, with the use of supplemental aids and

services, can be achieved satisfactorily"; and (2) if placement in a regular classroom

cannot be achieved, whether "the school has mainstreamed the child to the maximum

extent appropriate."  *L.B. ex rel. K.B.*, 379 F.3d at 967, 976-77 (adopting *Daniel R.R.*

test); *see also T.W. v. Unified Sch. Dist. No. 259*, 136 F. App'x 122, 127 (10th Cir.

2005) ("In determining whether a school district has complied with the LRE mandate,

we follow the so-called *Daniel R.R.* test.").[21]  In applying the first prong of this test,

---

[21]Plaintiffs do not clearly assert that G.W. should have been placed in a regular
education classroom or that some amount of mainstreaming was possible at Lakeview.
*See* Docket No. 105 at 19 (arguing only that BVSD should have offered a placement at
G.W.'s neighborhood school).  As a result, neither step of the *Daniel R.R.* test perfectly
addresses plaintiffs' arguments in this case.  *Compare P. ex rel. Mr. and Mrs. P v.
Newington Bd. of Educ.*, 546 F.3d 111, 121 (2d Cir. 2008) (addressing whether school

courts consider the following, non-exhaustive factors:

> (1) steps the school district has taken to accommodate the child in the regular classroom, including the consideration of a continuum of placement and support services; (2) comparison of the academic benefits the child will receive in the regular classroom with those [he] will receive in the special education classroom; (3) the child's overall educational experience in regular education, including non-academic benefits; and (4) the effect on the regular classroom of the disabled child's presence in that classroom.

*L.B. ex rel. K.B.*, 379 F.3d at 976.

The ALJ concluded that Lakeview was an appropriate educational placement because (1) J.W. did not challenge its academic program; (2) J.W.'s safety concerns regarding Lakeview were unfounded; (3) BVSD had "worked through various possible placements over time and . . . [had] come to believe that only Lakeview and Ivy Street could educate [G.W.] with his behavioral issues," a determination supported by the record; and (4) J.W. did not propose any alternative placement in Colorado that could meet G.W.'s needs. AR Vol. I at 11. The ALJ did not explicitly address the IDEA's least restrictive environment mandate. However, the factors listed above support the ALJ's overarching conclusion that a residential facility was the least restrictive environment capable of meeting G.W.'s educational needs.

As to the first factor, the record shows that by 2014, BVSD had explored a range of placement options for G.W., including education in a public school setting. *See* AR

_____

district violated the LRE mandate by recommending student's placement in regular classroom for 74% of the time); *Daniel R.R.*, 874 F.2d at 1048-49 (discussing two-part test and noting that the second part addresses whether a school district has taken appropriate "intermediate steps," such as "placing the child in regular education for some academic classes and in special education for others"). The Court therefore finds it appropriate to collapse the two steps into a single inquiry for purposes of determining whether a residential placement constituted G.W.'s least restrictive environment.

Vol. IV at 1 (Exhibit 1), 20 (Exhibit 2), 55-56 (Exhibit 6), 85 (Exhibit 11), 229-30 (Exhibit 19), 483 (Exhibit 52). The record further reflects that a variety of supplemental aids and services were used in an effort to accommodate G.W.'s needs in less restrictive educational environments, including a one-to-one aide, a modified curriculum, a behavior management plan, occupational therapy, speech therapy, visual schedules, and sensory-motor supports. *See* AR Vol. IV at 3-19 (Exhibit 2), 55-56 (Exhibit 6); *see also P. ex rel. Mr. and Mrs. P.*, 546 F.3d at 121 (finding no error in district court's determination that the school had made significant efforts to integrate the student in a mainstream classroom by utilizing "a variety of supplemental aids, including additional professionals, and modif[ying] the curriculum appropriately"); *T.W.*, 136 F. App'x at 127 (unpublished) (finding that first factor weighed in favor of school district where the district had utilized "a broad array of supplementary aids and services, including a one-on-one paraeducator, physical therapy, occupational therapy, speech therapy, and adapted physical education"). Plaintiffs have failed to demonstrate that these efforts were unreasonable.[22]

Regarding the second and third factors, there is little evidence in the record concerning G.W.'s experience in regular education. Based on the summary of G.W.'s educational history and Dr. Connery's neuropsychological report, it appears that G.W.

---

[22]J.W. suggested at the administrative hearing that BVSD should have allowed Ms. Collamer – or someone who was trained by her – to continue as G.W.'s one-to-one aide. *See* Supp. AR Vol. I at 215-16, 250-52. However, Mr. Sparks testified that Ms. Collamer was unable to provide one-to-one services because she was the behavior consultant for the entire school district. Supp. AR Vol. I at 147. He further testified that G.W.'s new one-to-one teacher and one-to-one aide consulted with Ms. Collamer. Supp. AR Vol. I at 147, 216.

was "mainstreamed in public school with the support of an Individualized Education Plan from first to sixth grades." AR Vol. IV at 1-2 (Exhibit 1), 55 (Exhibit 6). However, plaintiffs have not pointed to any evidence concerning G.W.'s academic progress during this period. While J.W. testified at the administrative hearing that G.W. had a 3.8 GPA at Boulder Valley Junior High School and did well at Monarch when he was working one-on-one with Dawn Collamer, Supp. AR Vol. I at 63, 73, plaintiffs have not provided G.W.'s academic records from these placements and other evidence indicates that G.W. was removed from public school due to increasing difficulties with self-regulation. *See* AR Vol. IV at 55-56 (Exhibit 6). Similarly, although G.W. made some progress toward his IEP goals at Spectra Autism Services in 2013, *see* AR Vol. IV at 6 (Exhibit 2), his behavioral issues also escalated during this period. *See* Supp. AR Vol. I at 241.

Additional evidence suggests that G.W. stood to benefit from a residential placement, such as Lakeview, with specific expertise in serving students with TBI. In her 2013 neuropsychological report, Dr. Connery stated that G.W. had an "extremely complex neurological history," AR Vol. IV at 62 (Exhibit 6), and would "continue to require intensive, individualized programming that is built around the foundation of intact, basic academic skills, relative strengths for verbal tasks, and relative strengths for social interactive skills with significant weaknesses for abstract reasoning, new learning, executive and adaptive skills." AR Vol. IV at 63 (Exhibit 6). She also noted reports from Spectra staff that G.W.'s "difficult behaviors consistently get in the way of his learning and academic goals." *Id.* at 56. Mr. Sparks interpreted Dr. Connery's report as indicating that G.W. would benefit from a placement "specifically focused on

traumatic brain injury," Supp. AR Vol. 1 at 41, and by January 2014, all members of

G.W.'s IEP team, including J.W., agreed that a residential placement was appropriate.

*See* AR Vol. IV at 230 (Exhibit 19).  Records from Lakeview show that G.W. progressed

both socially and academically in that setting.  *See* AR Vol. IV at 259-69 (Exhibit 22).

Thus, the evidence as a whole supports a finding that the benefits of a residential

placement outweighed the benefits G.W. would have received in a less restrictive

setting.

The final factor requires the Court to consider the effect of G.W.'s placement in a

regular classroom environment.  Although the record indicates that G.W. is a socially

engaged student with strong academic interests, *see* AR Vol. IV at 217 (Exhibit 19) –

attributes that would undoubtedly have a positive influence on other students – it also

shows that his difficulties with self-regulation have caused him to exhibit challenging

behaviors toward teachers and other students, leading to his dismissal from multiple

educational placements.  *See* AR Vol. IV at 63 (Exhibit 6), 87-90 (Exhibit 12), 262

(Exhibit 22), 282 (Exhibit 24).  Accordingly, this factor weighs in favor of a residential

placement.  *See T.W.*, 136 F. App'x at 132 (holding that fourth factor weighed in favor

of school district's placement where student's positive influence on peers was

outweighed by a "much larger amount of evidence indicat[ing] that [his] presence in the

regular classroom ha[d] often been disruptive").

While not specifically addressing any one of the above factors, plaintiffs contend

that G.W.'s behavior is less severe than other students with disabilities who have

received educational services in a public school setting.  *See* Docket No. 105 at 18;

Docket No. 116 at 2-3.  To support this argument, plaintiffs cite J.W.'s notes from the November 10, 2014 IEP meeting, which detail statements by a family friend whose son graduated from the Cherry Creek School District after receiving special education services.  AR Vol. III at 697.  The family friend noted that he had "seen a variety of students in the State who [had received] services in their local public school."  *Id.*  Other individuals allegedly expressed similar confusion regarding BVSD's inability to serve G.W. in Colorado.  *See id.*  The Court does not find this evidence persuasive.  None of these individuals were called to testify at the administrative hearing.[23]  Moreover, the experiences of other students do not undermine the conclusions of the IEP team regarding G.W.'s unique educational needs or the extent to which those needs could be accommodated in a mainstream environment.  *Cf. Rowley*, 458 U.S. at 181-82 (emphasizing the individualized nature of the IDEA's FAPE requirement).

Plaintiffs also argue that G.W.'s January 2014 and July 2014 IEPs do not provide a rational basis for residential placement due to behavioral issues.  Docket No. 116 at 1-4.  For example, plaintiffs note that G.W.'s January 2014 IEP stated that he was not exhibiting behavior requiring a behavior intervention plan.  Docket No. 116 at 2 (quoting AR Vol. IV at 224 (Exhibit 19)).  They further claim that the IEP was "quite explicit that G.W.'s behavior is fairly typical for children with the complexity of disabilities G.W. experiences."  *Id.*  Plaintiffs mischaracterize the evidence.  The cited portion of the IEP describes G.W.'s behavior without drawing any conclusions as to what constitutes "typical" behavior for students with TBI.  And, although the January 2014 IEP did not

---

[23]BVSD also has not stipulated to the accuracy of J.W.'s notes from the November 10, 2014 meeting.  Docket No. 111 at 8 n.4.

recommend a behavior intervention plan, behavior intervention plans were implemented by both Spectra and Lakeview in 2013 and 2014. *See* AR Vol. IV at 8 (Exhibit 2), 310 (Exhibit 28), 409 (Exhibit 38); *see also* AR Vol. IV at 65-66 (Exhibit 6) (recommending behavioral interventions). As to plaintiffs' arguments related to the July 2014 IEP, Docket No. 116 at 3-4, the record supports the ALJ's finding that G.W.'s difficulties with self-regulation persisted into the summer of 2014. *See* AR Vol. I at 265; AR Vol. IV at 262, 268 (Exhibit 22), 282 (Exhibit 24) (March 2014 functional behavioral assessment noting that G.W. "demonstrate[d] serious problem behaviors," including "disruptive behavior, destructiveness to property, and hurting others").[24] These behavioral issues manifested in both the home and educational settings. *See* AR Vol. IV at 262 (Exhibit 22) (listing verbal and physical aggressions at Lakeview between February 1, 2014 and May 31, 2014). Although plaintiffs correctly note that there had been a "decrease in the behavioral issues of aggression," Docket No. 116 at 4 (emphasis omitted) (quoting AR Vol. IV at 411 (Exhibit 38)); *see also* AR Vol. IV at 390 (Exhibit 38), they have not demonstrated that G.W.'s progress in this area warranted a change of placement to a less restrictive environment.[25]

─────────────────

[24]Plaintiffs appear to challenge this finding on the basis that G.W.'s July 2014 IEP did not include any goals related to behavior. *See* Docket No. 116 at 4. This argument is without merit. Plaintiffs do not argue that the July 2014 IEP was procedurally deficient for failing to identify behavioral goals. Moreover, the IEP specifically incorporates G.W.'s behavior intervention plan from Lakeview. AR Vol. IV AT 390 (Exhibit 38).

[25]Plaintiffs' argument is also weakened by the fact that G.W.'s progress could have been due to the intensive, residential services provided by Lakeview. *See T.W.*, 136 F. App'x at 131 (finding plaintiff's argument that the student's progress on his IEP goals supported his placement in a less restrictive environment to be "greatly weakened" by the ALJ's conclusion that the student's progress was "*solely* the result of

Because plaintiffs have not shown, by a preponderance of the evidence, that G.W.'s educational needs warranted a less restrictive placement, they cannot demonstrate either that BVSD's failure to conduct a reevaluation in November 2014 denied G.W. a FAPE or that BVSD violated the IDEA's substantive LRE mandate by continuing G.W.'s placement at a residential facility.[26]

## C.  Jefferson County School District

Plaintiff asserts that JCSD violated the IDEA by failing to provide G.W. with educational services after he transferred into the school district.  *See* Docket No. 82 at 4, ¶¶ 20-24; Docket No. 105 at 7, 22-23.  JCSD responds that plaintiffs' claim against JCSD must be dismissed because they have failed to exhaust their administrative remedies.  Docket No. 110 at 6, 8.

The IDEA contemplates that a parent will make an effort to resolve disputes concerning the provision of a FAPE at the administrative level before filing a civil action in state or federal court.  The Supreme Court has outlined the administrative process as follows:

---

the time he spent in one-on-one instruction").  Plaintiffs have pointed to no evidence that the same progress could have been achieved in a less restrictive setting.  *Compare id.* (citing testimony that student's IEP goals could have been "fulfilled in either a regular classroom or a self-contained environment," but finding such testimony ultimately insufficient to support a less restrictive placement).

[26]To the extent plaintiffs assert that BVSD violated the LRE mandate by continuing G.W.'s specific placement at Lakeview (as opposed to his general placement at a residential facility), *see supra* notes 4 & 13 (discussing distinction between "placement" and location of services), plaintiffs do not challenge the ALJ's finding that J.W.'s safety concerns about Lakeview in June and July 2014 were unfounded.  *See* AR Vol. I at 265.  Nor do they contend that BVSD's offer of Ivy Street School in November 2014, *see* AR Vol. III at 708, was insufficient to provide G.W. with a FAPE.

> a dissatisfied parent may file a complaint as to any matter concerning the provision of a FAPE with the local or state educational agency (as state law provides). *See* § 1415(b)(6). That pleading generally triggers a preliminary meeting involving the contending parties, § 1415(f)(1)(B)(i); at their option, the parties may instead (or also) pursue a full-fledged mediation process, *see* § 1415(e). Assuming their impasse continues, the matter proceeds to a due process hearing before an impartial hearing officer. § 1415(f)(1)(A); *see* § 1415(f)(3)(A)(i). . . . If the hearing is initially conducted at the local level, the ruling is appealable to the state agency. *See* § 1415(g). Finally, a parent unhappy with the outcome of the administrative process may seek judicial review by filing a civil action in state or federal court. *See* § 1415(i)(2)(A).

*Fry v. Napoleon Cmty. Schools,* 137 S. Ct. 743, 749 (2017). JCSD argues that plaintiffs failed to exhaust administrative remedies because they never filed an IDEA complaint against JCSD at the administrative level. Docket No. 110 at 6. The administrative decision from which plaintiffs appeal relates to a due process complaint filed by JCSD against J.W. based on her refusal to provide written consent for an evaluation of G.W. *See* Docket No. 110 at 7; AR Vol. II at 598 (administrative decision); *see also* 20 U.S.C. § 1414(a)(1)(D)(ii)(I) (providing that, if a parent does not give consent for an initial evaluation, a local educational agency may pursue an evaluation through the procedures set forth in § 1415). The scope of the administrative hearing was limited to determining whether JCSD could perform the evaluation. AR Vol. II at 604. J.W. did not appear at the hearing or present any evidence regarding JCSD's failure to provide G.W. with a FAPE. Supp. AR Vol. III at 5.

Plaintiffs do not challenge JCSD's characterization of their claim on appeal or argue that they exhausted administrative remedies with respect to that claim. Instead, they contend that JCSD waived the issue of IDEA exhaustion by failing to plead it as an affirmative defense in its answer. Docket No. 116 at 10-11. The Court disagrees.

IDEA's exhaustion requirement is not subject to waiver because it is treated as a jurisdictional requirement under Tenth Circuit law.  *See, e.g.*, *Cudjoe v. Independent Sch. Dist. No. 12*, 297 F.3d 1058, 1063 (10th Cir. 2002) (characterizing compliance with IDEA's exhaustion requirement as a jurisdictional issue); *Urban v. Jefferson Cty. Sch. Dist. R-1*, 89 F.3d 720, 725 (10th Cir. 1996) (holding that district court correctly dismissed IDEA claims for lack of jurisdiction where the plaintiff failed to exhaust administrative remedies).  While recent cases have questioned whether this precedent has been impliedly overruled by Supreme Court decisions cautioning against the use of the "jurisdictional" label, *see, e.g.*, *Muskrat v. Deer Creek Public Schs.*, 715 F.3d 775, 783-84 (10th Cir. 2013) (internal quotation marks omitted), the Tenth Circuit has so far declined to revisit the issue.  *See, e.g.*, *A.P., IV by Porco v. Lewis Palmer Sch. Dist. No. 38*, 728 F. App'x 835, 839 n.2 (10th Cir. 2018) (unpublished) (declining to address school district's argument that the IDEA's exhaustion requirement is jurisdictional); *Carroll v. Lawton Indep. Sch. Dist. No. 8*, 805 F.3d 1222, 1230 n.4 (10th Cir. 2015) (noting that, because the school district raised the exhaustion requirement in its motion to dismiss, there was no need to determine whether exhaustion is jurisdictional); *see also Smith v. Cheyenne Mountain Sch. Dist. 12*, No. 15-00881-PAB-CBS, 2017 WL 2791415, at *14 (D. Colo. May 11, 2017) (noting that the "Tenth Circuit does not appear to have confronted a case requiring resolution of the question" of whether IDEA exhaustion is a jurisdictional requirement), *report and recommendation adopted by* 2017 WL 2778556 (D. Colo. June 26, 2017).  Moreover, this Court recently adopted a recommendation by a magistrate judge thoroughly analyzing the question of whether

IDEA exhaustion remains a jurisdictional prerequisite. After considering the language of the statute, the policies underlying the IDEA, and Supreme Court case law, the magistrate judge concluded that a parent's failure to exhaust administrative remedies with respect to an IDEA claim eliminates a federal court's subject matter jurisdiction. *See Smith*, 2017 WL 2791415, at *17.

Plaintiffs provide no reasoned argument why the Court should depart from this holding. Thus, consistent with binding Tenth Circuit precedent and this Court's recent decision in *Smith*, the Court finds that plaintiffs' failure to exhaust administrative remedies as to JCSD's alleged denial of educational benefits deprives the Court of jurisdiction over their claim. *Accord Jump v. Springer Municipal Schs.*, 2015 WL 13651163, at *5-6 (D.N.M. Oct. 14, 2015) (dismissing IDEA claims for lack of subject matter jurisdiction after concluding that the court was "bound to follow existing [Tenth Circuit] law which provides that [IDEA] exhaustion is a jurisdictional matter"); *J.H. ex rel. J.P. v. Bd. of Educ.*, 2015 WL 13666988, at *1-2 (D.N.M. Feb. 17, 2015) (dismissing ADA claims for lack of subject matter jurisdiction where plaintiffs had failed to exhaust their administrative remedies under the IDEA).[27]

Even if the Court were to conclude that IDEA exhaustion is non-jurisdictional, JCSD did not waive the exhaustion issue by failing to plead it in its answer. The

---

[27]Plaintiffs do not argue that their claim against JCSD satisfies one of the three exceptions to the IDEA's exhaustion requirement, *see Ellenberg v. N.M. Military Inst.*, 478 F.3d 1262, 1276 (10th Cir. 2007) (explaining that failure to exhaust under the IDEA is "excused if the relief [a plaintiff] seek[s] is not available under the IDEA," "pursuing administrative remedies would be futile," or the "agency has adopted a policy or pursued a practice of general[] . . . applicability that is contrary to the law" (internal quotation marks omitted), and there is no indication that any of these exceptions would apply in this case.

Federal Rules of Civil Procedure require that any affirmative defense be stated in response to a pleading. *See* Fed. R. Civ. P. 8(c). However, "strict adherence to [this requirement] is inappropriate" when the purpose underlying the rule – ensuring that the opposing party has "notice of the defense and a chance to argue, if he can, why the imposition of the defense would be inappropriate" – has been fulfilled through other means. *Ahmad v. Furlong*, 435 F.3d 1196, 1201 (10th Cir. 2006) (internal quotation marks and brackets omitted). Accordingly, courts have routinely allowed defendants to raise affirmative defenses for the first time in a dispositive motion when doing so would not cause plaintiffs unfair prejudice. *See id.* at 1202 (collecting cases).

In determining whether to permit a defendant to constructively amend an answer through a dispositive motion, courts in the Tenth Circuit "apply the same standards that govern motions to amend." *Id.* Thus, constructive amendment may be denied on grounds of undue delay, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or unfair prejudice to the opposing party. *See id.*; *see also Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993) (reciting rules governing amendment under Fed. R. Civ. P. 15(a). None of these factors are present in this case. JCSD placed plaintiffs on notice of the exhaustion issue as early as March 21, 2016, when it moved to dismiss plaintiffs' original complaint based, in part, on their failure to exhaust administrative remedies. *See* Docket No. 36 at 7. Although JCSD did not re-assert the exhaustion issue as an affirmative defense in its answer to the amended complaint, it denied plaintiffs' allegation that the "Colorado Department of Education merged the State Complaint [regarding JCSD's refusal to provide G.W.

educational services] with [JCSD's] due process complaint," Docket No. 87 at 4, ¶ 25, and stated that J.W. did not ask the Colorado Department of Education to reopen her state complaint against JCSD, which had been held in abeyance, after her due process complaint against BVSD was resolved. *Id.* at 4-5, ¶ 25. Finally, JCSD raised plaintiffs' failure to exhaust in response to the opening brief, thereby giving plaintiffs ample opportunity to address the merits of the defense in their reply. *See* Docket No. 110 at 8. Given these facts, plaintiffs cannot show that they were unfairly prejudiced by JCSD's failure to plead the exhaustion requirement as an affirmative defense. *See Buckles Mgmt., LLC v. InvestorDigs, LLC*, 728 F. Supp. 2d 1145, 1149 (D. Colo. 2010) (finding that defendants' " failure to plead [their statute of frauds] defense in the answer" did not result in unfair prejudice where the plaintiffs "addressed fully the merits of the defense in their response" to defendants' motion for summary judgment).[28]

Because there has been no showing of prejudice, undue delay, bad faith, or dilatory motive, JCSD's failure to plead IDEA exhaustion as an affirmative defense did not constitute a waiver of the issue. Plaintiffs do not otherwise dispute that they failed to exhaust administrative remedies with respect to their IDEA claim against JCSD. *See* Docket No. 116 at 10-11.[29] That claim will therefore be dismissed.

_____

[28]It was not unreasonable for JCSD to think that raising the exhaustion issue in its response brief would be adequate to preserve the issue for judicial review, given the parties' agreement that the case – now limited to plaintiffs' IDEA and § 504 claims – could be resolved based on the administrative record and one round of briefing. *See* Docket No. 92 at 8-9.

[29]For instance, plaintiffs do not argue that J.W.'s separate state complaint against JCSD, which was held in abeyance, was sufficient to satisfy the exhaustion requirement.

## IV. SECTION 504

Plaintiffs' amended complaint also asserts claims against JCSD and BVSD for disability discrimination in violation of § 504 of the Rehabilitation Act.  Docket No. 82 at 5.  Defendants argue that plaintiffs waived these claims by failing to address them in their opening brief.  *See* Docket No. 110 at 7; Docket No. 111 at 19.  The Court agrees.

Although IDEA claims and § 504 claims may sometimes follow different procedural paths in federal court, *compare L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004) (explaining that "the IDEA requires a district court to grant judgment on the [administrative] record based on its own ascertainment of the preponderance of the evidence"), *with Roberts v. Progressive Indep., Inc.*, 183 F.3d 1215, 1219 (10th Cir. 1999) (noting that, of the two Rehabilitation Act claims asserted by the plaintiff, one was dismissed on summary judgment and one proceeded to a jury trial), the parties in this case agreed to resolve plaintiffs' claims based on the administrative record and one round of briefing.  *See* Docket No. 92 at 7-9.  As a result, plaintiffs were required to raise any arguments pertaining to their § 504 claims in their opening brief.  Their failure to do so constitutes a waiver of those claims.  *See United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019) ("Ordinarily, a party's failure to address an issue in its opening brief results in that issue being deemed waived."); *Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Public Schs.*, 565 F.3d 1232, 1246 (10th Cir. 2009) ("[A] denial under the IDEA does not ineluctably establish a violation of section 504 . . . .  Discrimination claims may not be tacked on as an afterthought to

IDEA claims, but must be litigated in their own right.").[30]

## V. CONCLUSION[31]

For the foregoing reasons, it is

**ORDERED** that the decisions of the ALJ are **AFFIRMED**. It is further

**ORDERED** that plaintiffs' claims against BVSD are **DISMISSED** with prejudice. It is further

**ORDERED** that plaintiffs' § 504 claim against JCSD is **DISMISSED** with prejudice. It is further

**ORDERED** that plaintiffs' IDEA claim against JCSD is **DISMISSED** without prejudice for lack of jurisdiction. It is further

**ORDERED** that, within 14 days of the entry of this order, defendants may have their costs by filing a Bill of Costs with the Clerk of the Court. It is further

**ORDERED** that this case is closed.

DATED September 18, 2019.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
Chief United States District Judge

---

[30]The Tenth Circuit defines waiver as "the intentional relinquishment or abandonment of a known right." *See Vreeland v. Zupan*, 906 F.3d 866, 876 (10th Cir. 2018). Plaintiffs' failure to address their § 504 claims or defendants' waiver argument in their reply brief, *see* Docket No. 116, supports a finding that plaintiffs have intentionally, rather than inadvertently, abandoned those claims.

[31]Given the Court's resolution of plaintiffs' claims, the Court need not address the remaining arguments raised in the parties' briefs.